## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**JULIO VILLANUEVA-VASQUEZ,**

     **Petitioner,**

**v.**                           **Case No. 8:21-cv-2896-MSS-CPT**

**SECRETARY, DEPARTMENT OF
CORRECTIONS,**

     **Respondent.**

_____

## <u>ORDER</u>

Julio Villanueva-Vasquez petitions for a writ of habeas corpus under 28 U.S.C. § 2254 and challenges his state-court convictions for attempted second-degree murder, aggravated stalking, burglary of a dwelling with an assault or battery, violation of a domestic-violence injunction, and criminal mischief. After reviewing the petition (Dkt. 1), the response (Dkt. 8), the appendix containing the relevant state-court record (Dkt. 8-2; Dkt. 8-3), and the reply (Dkt. 9), the Court **DENIES** the petition.

## I.    BACKGROUND

### A.    Factual Background

In the spring of 2013, Villanueva-Vasquez stalked, harassed, and attempted to murder Kathernez Villanueva, his estranged wife. The two were married in 2007 and had a child together, J.V. (Dkt. 8-2, Ex. 9, at 182-83) The victim filed for divorce in April 2012 and obtained a domestic-violence injunction against Villanueva-Vasquez in August 2012. (<u>Id.</u> at 186-87) The injunction required Villanueva-Vasquez to "stay

300 feet away from" the victim until August 2013. (Id. at 189-90) It also forbade him from "com[ing] near" the victim's "home" or "job." (Id. at 188)

Villanueva-Vasquez began to stalk and harass the victim in April 2013. At the time, the victim drove J.V. to school in the mornings. (Id. at 193) Two or three times a week, Villanueva-Vasquez would sit in his car "a couple blocks" from the victim's house and wait for her to pass him on the way to school. (Id. at 197-201) During a separate incident, the victim was driving home with J.V. when she saw Villanueva-Vasquez "pass by" in the opposite direction. (Id. at 202) She made a U-turn and pulled into a gas station. (Id. at 203) Villanueva-Vasquez parked "[r]ight next" to her and called out to J.V. (Id. at 204) The victim allowed J.V. to approach Villanueva-Vasquez, explaining later that she did not "want [her] son to feel like [she was] denying him permission" to "see his father." (Id. at 206)

Another incident took place at an apartment complex where J.V.'s godmother lived. (Id. at 208-09) The victim, J.V., and his godmother were spending time in the "pool area" when Villanueva-Vasquez showed up uninvited. (Id. at 210-11) Again, the victim allowed J.V. to approach his father. (Id. at 211) After some time, the victim told J.V. to "go back to the pool." (Id.) Villanueva-Vasquez said, "I am not done," and began to argue with the victim and J.V.'s godmother. (Id. at 212) During the argument, he told J.V.'s godmother that "she had five days to leave because he was going to call immigration on her." (Id. at 213) Villanueva-Vasquez eventually left the pool area without further incident. (Id. at 213-14)

Villanueva-Vasquez also called the victim at work several times a day. (Id. at 217-18) Sometimes he was "nice," telling the victim that she was "the best mother he could have chose[n] for his child." (Id. at 218) Other times he was "upset" and "angry." (Id.) Once he suggested that she was "prostituting [herself]" and asked "[h]ow many customers per day [she serviced]." (Id.) In addition to phone calls, Villanueva-Vasquez sent the victim numerous text messages. (Id. at 220-43) In one text, he said "[t]hat assh*le boyfriend of yours" "cannot defend you." (Id. at 447)

Matters escalated around 1:30 a.m. on May 19, 2013. The victim lived in an "efficiency" in her aunt and uncle's garage. (Id. at 191-92) A male friend, Wilson Chaparro, was spending the night with the victim in her residence. (Id. at 246-47) The victim heard a "scratching" noise coming from the front door. (Id. at 248) She looked outside and saw a man "kneel[ing] down, trying to break in" with a screwdriver. (Id. at 252, 254) When she opened the door, the man grabbed her and "pushed to get in." (Id. at 255) He was wearing a ski mask and a "charcoal Nike hoodie." (Id. at 259) The victim immediately identified the intruder as Villanueva-Vasquez based on his "eyes and mouth"; she also recognized the hoodie, which Villanueva-Vasquez had received from the victim's brother "back in 2007." (Id. at 260)

The two began to struggle inside the residence. (Id. at 261-63) Chaparro heard the victim say, "Stop, Julio." (Id. at 176) At some point, Villanueva-Vasquez pulled out a handgun, pointed it at the victim, and pulled the trigger. (Id. at 265-67) The victim heard a "click"; the gun did not fire. (Id. at 268) Villanueva-Vasquez racked the slide and tried to shoot the victim again, but the gun did not discharge. (Id. at 268-70)

3

He racked the slide one more time and pulled the trigger. (Id. at 270) Again, the gun misfired. (Id. at 270-71) At this point, Chaparro called the police and yelled, "911, we have just been attacked, send somebody over." (Id. at 271) Upon hearing this, Villanueva-Vasquez "took off running." (Id.)

Law enforcement arrived and began to search the area. (Id. at 413) Officers discovered that all four tires on Chaparro's vehicle had been "punctured and slashed." (Id. at 401) Three other vehicles were parked outside the residence; none had been damaged. (Id. at 402) Law enforcement also recovered (1) a live .380 bullet on the threshold of the front door, (2) an open pocketknife "on the ground outside [the] front door," and (3) a "screwdriver without a handle" outside the residence. (Id. at 384-85, 400-01, 403-04)

### B.    Procedural History

Following a jury trial, Villanueva-Vasquez was found guilty of attempted second-degree murder, aggravated stalking, burglary of a dwelling with an assault or battery, violation of a domestic-violence injunction, and criminal mischief. (Id., Ex. 10) He received a total sentence of twenty years in prison. (Id., Ex. 13) At the time he committed his crimes, Villanueva-Vasquez was on probation. (Id., Ex. 4) After the guilty verdict, the trial court revoked his probation and sentenced him to "time served" for violating his probation by committing new criminal conduct. (Id., Ex. 5; Ex. 12, at 34)

After an unsuccessful direct appeal, (id., Ex. 19), Villanueva-Vasquez moved for postconviction relief under Florida Rule of Criminal Procedure 3.850. (Dkt. 8-3,

Exs. 20, 22, 24) The postconviction court denied several claims without a hearing. (Dkt. 8-3, Exs. 21, 23, 26, 30) It held an evidentiary hearing on the one remaining claim, which it subsequently rejected in a written order. (Id., Exs. 31, 33) The appellate court affirmed the denial of relief without opinion. (Id., Ex. 38) This federal habeas petition followed. (Dkt. 1)

## II.   LEGAL STANDARDS

### A.   AEDPA

Because Villanueva-Vasquez filed his federal petition after the enactment of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), AEDPA governs his claims. Lindh v. Murphy, 521 U.S. 320, 327 (1997). AEDPA amended 28 U.S.C. § 2254(d) to require:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question

of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." <u>Williams v. Taylor</u>, 529 U.S. 362, 412-13 (2000). A decision involves an unreasonable application of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." <u>Id.</u> at 413. Clearly established federal law refers to the holding of an opinion by the United States Supreme Court at the time of the relevant state-court decision. <u>Id.</u> at 412.

"[AEDPA] modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." <u>Bell v. Cone</u>, 535 U.S. 685, 694 (2002). A federal petitioner must show that the state court's ruling was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." <u>Harrington v. Richter</u>, 562 U.S. 86, 103 (2011).

The appellate court affirmed Villanueva-Vasquez's convictions, as well the denial of postconviction relief, without discussion. (Dkt. 8-2, Ex. 19; Dkt. 8-3, Ex. 38) A federal court "'look[s] through' the unexplained decision to the last related state-court decision that does provide a relevant rationale [and] presume[s] that the unexplained decision adopted the same reasoning." <u>Wilson v. Sellers</u>, 138 S. Ct. 1188, 1192 (2018). Because the postconviction court provided reasons for denying Villanueva-Vasquez's claims in written orders, (Dkt. 8-3, Exs. 21, 30, 33), this Court

evaluates those reasons under § 2254(d).

**B.      Ineffective Assistance of Counsel**

Villanueva-Vasquez asserts ineffective assistance of counsel—a difficult claim to sustain. Strickland v. Washington, 466 U.S. 668, 687 (1984), explains:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

"There is no reason for a court . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." Id. at 697. "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Id. at 690. "[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." Id.

"An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." Id. at 691. To demonstrate prejudice, the defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. A reasonable probability is a "probability sufficient to undermine confidence in the outcome." Id. at 694.

Strickland cautions that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." Id. at 690-91. A defendant cannot meet his burden by showing that the avenue chosen by counsel was unsuccessful. White v. Singletary, 972 F.2d 1218, 1220-21 (11th Cir. 1992).

Because the standards under Strickland and AEDPA are both highly deferential, "when the two apply in tandem, review is 'doubly' so." Richter, 562 U.S. at 105. "Given the double deference due, it is a 'rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas proceeding.'" Nance v. Warden, Ga. Diag. Prison, 922 F.3d 1298, 1303 (11th Cir. 2019) (citation omitted).

### C.   Exhaustion and Procedural Default

A petitioner must exhaust the remedies available in state court before a federal court can grant habeas relief. 28 U.S.C. § 2254(b)(1)(A). The petitioner must (1) alert the state court to the federal nature of his claim and (2) give the state court one full opportunity to resolve the federal claim by invoking one complete round of the state's established appellate review process. O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999); Picard v. Connor, 404 U.S. 270, 278 (1971). The state court must have the first opportunity to review and correct any alleged violation of a federal right. Baldwin v. Reese, 541 U.S. 27, 29 (2004).

A federal court may stay—or dismiss without prejudice—a habeas case to allow a petitioner to return to state court to exhaust a claim. Rhines v. Weber, 544

U.S. 269 (2005); Rose v. Lundy, 455 U.S. 509 (1982). If the state court would deny the claim on a state procedural ground, the federal court denies the claim as procedurally barred. Snowden v. Singletary, 135 F.3d 732, 736 (11th Cir. 1998) (citing Coleman v. Thompson, 501 U.S. 722, 735 n.1 (1991)).

Also, a petitioner's failure to comply with a state procedural rule governing the proper presentation of a claim bars review of that claim on federal habeas. Coleman, 501 U.S. at 729. "[A] state court's rejection of a federal constitutional claim on procedural grounds will only preclude federal review if the state procedural ruling rests upon [an] 'independent and adequate' state ground." Judd v. Haley, 250 F.3d 1308, 1313 (11th Cir. 2001). A state court's procedural ruling rests on an independent and adequate state ground if (1) the last state court rendering a judgment in the case clearly and expressly relies on a state procedural rule to resolve the federal claim without reaching the merits of the claim, (2) the state court's decision rests solidly on state-law grounds and is not intertwined with an interpretation of federal law, and (3) the state procedural rule is not applied in an "arbitrary or unprecedented fashion" or in a "manifestly unfair" manner. Id. (citing Card v. Dugger, 911 F.2d 1494, 1516-17 (11th Cir. 1990)).

To excuse a procedural bar on federal habeas, a petitioner must demonstrate either (1) cause for the default and actual prejudice from the alleged violation of federal law or (2) a miscarriage of justice. Maples v. Thomas, 565 U.S. 266, 280 (2012); House v. Bell, 547 U.S. 518, 536-37 (2006).

## III.   DISCUSSION

### A.   Ground One—Denial of Motion to Interview Jury Foreperson

Villanueva-Vasquez argues that the trial court violated his federal right to due process and a fair trial by denying his motion to interview the jury foreperson. (Dkt. 1 at 20-21) After the verdict was read, the court asked whether the parties wished to "have the jury polled." (Dkt. 8-2, Ex. 9, at 594) Defense counsel said, "Yes." (Id.) The clerk asked each of the six jurors the same question: "[I]s this your verdict?" (Id. at 594-95) Five jurors responded, "Yes." (Id.) The foreperson was polled last. (Id. at 595) When asked "is this your verdict," he responded, "How do you answer it?" (Id.) The court said, "You have to answer yes or no, is that your verdict?" (Id.) The foreperson then stated, "Yes." (Id.)

Based on this exchange, Villanueva-Vasquez filed a motion to interview the foreperson. (Id., Ex. 11) He noted that "[t]he jury was comprised of four white men, one white woman, and one black man." The black man was the foreperson. (Id. at 85) Villanueva-Vasquez sought to "inquire of the foreperson whether there were any overt appeals to racial, ethnic, and religious bias" during deliberations. (Id. at 86) He also intended to ask whether the foreperson—the "one minority member of the jury"—had been subjected to "coercion" by other jurors. (Id.) The prosecution opposed the request, arguing that there was no "indication" that the foreperson "was pressured, was bullied, was approached in any way by other members of the jury because of his race." (Id., Ex. 12, at 8) The court denied the request to interview the foreperson, (id. at 9), and that decision was affirmed on appeal without explanation. (Id., Ex. 19)

Villanueva-Vasquez now contends that the denial of his request to interview the foreperson violated his right to due process and a fair trial under the federal constitution. (Dkt. 1 at 20-21) He claims that the foreperson's question during the polling—"How do you answer it?"—"raised questions in the mind of the defense that the [foreperson] may have been subjected to racial, ethnic, or religious bias since he was the only minority on the jury." (Id.)

Respondent maintains that Villanueva-Vasquez failed to exhaust this claim because he did not argue on direct appeal that the denial of his request "violated his federal due process or fair trial rights, or any other federal constitutional right." (Dkt. 8 at 5-6) The Court need not decide this issue. Even assuming Villanueva-Vasquez exhausted his state-court remedies, he cannot show that the rejection of Ground One was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); see also Cook v. McNeil, 266 F. App'x 843, 846 (11th Cir. 2008) (affirming denial of habeas petition because, "[e]ven if [petitioner] exhausted his due process claim," he could not "establish either that the state courts applied a standard contrary to federal law or that they applied that precedent in an unreasonable manner");[1] Acosta v. Artuz, 575 F.3d 177, 188-89 (2d Cir. 2009) ("Even if we were to assume that [petitioner] adequately exhausted state remedies on the precise challenge to the admission of his confession that he now raises in his habeas petition, we would agree

---

[1] The Court notes that "[a]lthough an unpublished opinion is not binding on this court, it is persuasive authority. See 11th Cir. R. 36-2." United States v. Futrell, 209 F.3d 1286, 1289 (11th Cir. 2000).

with the district court that no relief is warranted because [he] has not demonstrated that the state court's rejection of his claim on the merits was an objectively unreasonable application of clearly established Supreme Court precedent.").

"[C]learly established Federal law" means "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions *as of the time of the relevant state-court decision*." Williams v. Taylor, 529 U.S. 362, 412 (2000) (emphasis added). AEDPA "requires federal courts to 'focu[s] on what a state court knew and did,' and to measure state-court decisions 'against [the Supreme] Court's precedents *as of 'the time the state court renders its decision*.'" Greene v. Fisher, 565 U.S. 34, 38 (2011) (quoting Cullen v. Pinholster, 563 U.S. 170, 182 (2011)); see also Brooks v. Comm'r, Ala. Dep't of Corr., 719 F.3d 1292, 1305 n.3 (11th Cir. 2013) (noting that a Supreme Court decision "postdate[d] the state-court decision in this case, and therefore could not . . . be the basis to reverse the state court's decision"). Accordingly, "it is not 'an unreasonable application of' 'clearly established Federal law' for a state court to decline to apply a specific legal rule that has not been squarely established by [the Supreme] Court." Knowles v. Mirzayance, 556 U.S. 111, 122 (2009).

The appellate court affirmed Villanueva-Vasquez's convictions—and rejected his juror-interview claim—in July 2016. (Dkt. 8-2, Ex. 19) At that time, Florida law followed the no-impeachment rule, which forbids "[j]uror interviews . . . relative to any matter that inheres in the verdict itself and relates to the jury's deliberations." Reaves v. State, 826 So. 2d 932, 943 (Fla. 2002). Matters that "inhere in the verdict" include the following: "that the juror did not assent to the verdict; that he

misunderstood the instructions of the [c]ourt"; or "that he was unduly influenced by the statements or otherwise of his fellow-jurors, or mistaken in his calculations or judgment." Marshall v. State, 854 So. 2d 1235, 1240 (Fla. 2003).

At the time of the state-court decision in Villanueva-Vasquez's case, the Supreme Court had "twice addressed whether the no-impeachment rule contained a constitutional exception." Tharpe v. Warden, 898 F.3d 1342, 1345 (11th Cir. 2018) (citing Tanner v. United States, 483 U.S. 107, 125 (1987); Warger v. Shauers, 574 U.S. 40, 51 (2014)). "Each time, the Supreme Court concluded it did not." Id. It was not until March 2017—several months after the state-court decision in this case—that the Supreme Court first recognized a constitutional exception to the no-impeachment rule in Pena-Rodriguez v. Colorado, 580 U.S. 206, 209 (2017). See Tharpe, 898 F.3d at 1345 ("Pena-Rodriguez was a startling development because for the first time, the Court create[d] a constitutional exception to no-impeachment rules." (citation omitted)). Specifically, Pena-Rodriguez held that "where a juror makes a clear statement that indicates he or she relied on racial stereotypes or animus to convict a criminal defendant, the Sixth Amendment requires that the no-impeachment rule give way in order to permit the trial court to consider the evidence of the juror's statement and any resulting denial of the jury trial guarantee." Pena-Rodriguez, 580 U.S. at 225.

Thus, when the appellate court rejected Villanueva-Vasquez's juror-interview claim, "clearly established law . . . did not provide for constitutional exceptions to [the] no-impeachment rule[ ]." Richardson v. Kornegay, 3 F.4th 687, 706 (4th Cir. 2021). In other words, the Supreme Court had yet to "squarely establish[ ]" that the federal

constitution placed any limits on the rule that barred Villanueva-Vasquez's request to interview the foreperson. <u>Knowles</u>, 556 U.S. at 122. This means that Villanueva-Vasquez cannot show that the rejection of his juror-interview claim was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

Even if <u>Pena-Rodriguez</u> could be considered on federal habeas review, it would not assist Villanueva-Vasquez. <u>Pena-Rodriguez</u> held that, "[f]or the [judicial] inquiry to proceed, there must be a showing that one or more jurors made statements exhibiting overt racial bias that cast serious doubt on the fairness and impartiality of the jury's deliberations and resulting verdict." <u>Pena-Rodriguez</u>, 580 U.S. at 225. "To qualify, the statement must tend to show that racial animus was a significant motivating factor in the juror's vote to convict." <u>Id.</u> at 225-26. "Whether that threshold showing has been satisfied is a matter committed to the substantial discretion of the trial court in light of all the circumstances, including the content and timing of the alleged statements and the reliability of the proffered evidence." <u>Id.</u> at 226. The required showing was made in <u>Pena-Rodriguez</u> itself. There, two jurors claimed that another juror had said during deliberations, "I think [the defendant] did it because he's Mexican and Mexican men take whatever they want." <u>Id.</u> at 213.

By contrast, Villanueva-Vasquez fails to make a "threshold showing" that "one or more jurors made statements exhibiting overt racial bias that cast serious doubt on the fairness and impartiality of the jury's deliberations and resulting verdict." <u>Id.</u> at 225. His claim rests entirely on the exchange that took place when the foreperson—

14

the sole non-white member of the jury—was polled about the verdict. As noted above, the foreperson was asked, "[I]s this your verdict?" (Dkt. 8-2, Ex. 9, at 595) He responded, "How do you answer it?" (Id.) The court explained, "You have to answer yes or no, is that your verdict?" (Id.) The foreperson then said, "Yes." (Id.) Nothing about this exchange suggests that any juror "relied on racial stereotypes or animus to convict" Villanueva-Vasquez. Pena-Rodriguez, 580 U.S. at 225. Nor does the colloquy imply that the foreperson was "subjected to racial, ethnic, or religious bias" by other members of the jury. (Dkt. 1 at 21) Therefore, even if Pena-Rodriguez were applicable here, Villanueva-Vasquez would not be entitled to relief.

### B.    Ground Two—English Translation of Spanish-Language Texts

As noted above, the prosecution presented a series of text messages that Villanueva-Vasquez sent to the victim. (Dkt. 8-2, Ex. 9, at 220-43) The texts were written in Spanish. (Id.) The prosecution initially proposed to have the victim translate the texts into English, but the trial court sustained Villanueva-Vasquez's objection to that procedure. (Id. at 225-29) Instead, the court ruled that the Spanish interpreter— who was already interpreting the proceedings for Villanueva-Vasquez—could take the stand and translate the texts into English for the jury. (Id. at 228-29) That procedure was followed. The interpreter was called as a witness. (Id. at 439) She testified that she had served as a Spanish court interpreter for twenty years, and that she was "proficient in both auditory interpretation . . . as well as written interpretation." (Id. at 441-42) The interpreter then provided an English translation of each Spanish-language text.

(Id. at 442-49) Defense counsel briefly cross-examined the interpreter, asking her to clarify the meaning of two texts. (Id. at 450-51)

When the jurors retired to deliberate, they received copies of the Spanish-language texts. (Id. at 452-53) They did not, however, receive a written English translation, because none existed. (Id.) During deliberations, the jury asked for a "translation" of certain texts. (Id. at 588) The court directed the court reporter to "read back" the "portion of the testimony" in which the interpreter had translated the relevant texts into English. (Id.) The testimony was read back, and the jury did not ask any further questions about the texts. (Id. at 590-92)

Villanueva-Vasquez now contends that the trial court's "rulings regarding the admission of the text[s]" violated his federal right to due process and a fair trial. (Dkt. 1 at 23) Specifically, he complains that the court "allowed the Spanish-language text[s] to be translated and read to the jury, but there was no transcript of the messages in English, and the jury did not speak or read Spanish." (Id.) According to Villanueva-Vasquez, the "[f]ailure to provide [a written] English translation of the texts created unfair prejudice, confused the issues, and misled the jury." (Id.) Villanueva-Vasquez does not, however, allege that any of the translations misstated the meaning of the texts.

Respondent is correct that this claim is unexhausted. (Dkt. 8 at 12) Proper exhaustion requires a petitioner to "make the state court aware that the claims asserted present federal constitutional issues." Jimenez v. Fla. Dep't of Corr., 481 F.3d 1337, 1342 (11th Cir. 2007). Thus, "a petitioner with a claim that could arise under either

state or federal law must clearly indicate to the state courts that he intends to bring a federal claim." Preston v. Sec'y, Fla. Dep't of Corr., 785 F.3d 449, 458 (11th Cir. 2015).

Villanueva-Vasquez argued on direct appeal that the failure to provide an English transcript of the texts "violated [his] right to a fair and impartial trial and to due process of law." (Dkt. 8-2, Ex. 16, at 25-26) But he never asserted a violation of his *federal* right to a fair trial or due process. As the Eleventh Circuit has explained, the bare assertion that a defendant "was denied due process and a fair trial" is "insufficient to present" a federal claim because "this language could just be asserting a fair trial claim under the Florida Constitution and Florida's Due Process Clause." Zeigler v. Crosby, 345 F.3d 1300, 1308 n.5 (11th Cir. 2003); see also Kelly v. Sec'y, Dep't of Corr., No. 8:10-cv-2622-JDW-MAP, 2014 WL 806344, at *7 (M.D. Fla. Feb. 27, 2014) ("Petitioner's cursory and vague statement in his Initial Brief that he 'was denied his due process right to a fair trial' was no more than a 'needle in a haystack,' and insufficient to present fairly to the state appellate court a federal constitutional issue."). "Under these circumstances, [Villanueva-Vasquez] cannot be said to have fairly apprised the state court of his federal . . . claim." Preston, 785 F.3d at 459.

Villanueva-Vasquez cannot return to state court to present his unexhausted claim in a second, untimely direct appeal. See Fla. R. App. P. 9.140(b)(3) (stating that a notice of appeal must be filed within thirty days of the rendition of a sentence). As a result, Ground Two is procedurally defaulted. See Smith v. Jones, 256 F.3d 1135, 1138 (11th Cir. 2001) ("If the petitioner has failed to exhaust state remedies that are no

longer available, that failure is a procedural default which will bar federal habeas relief, unless either the cause and prejudice or the fundamental miscarriage of justice exception is established."). And because Villanueva-Vasquez has not shown that an exception applies to overcome the default, this claim is barred from federal habeas review.

Even if Villanueva-Vasquez had properly exhausted Ground Two, he cannot show that the trial court's handling of the texts was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). The Supreme Court has never "squarely established" that the constitution forbids the procedure employed here—that is, a court interpreter translates Spanish-language texts into English for the jury, which does not receive an English transcript of the material, subsequent to which the jury asks for a read back of the interpreter's translation. Knowles, 556 U.S. at 122; see also United States v. Grajales-Montoya, 117 F.3d 356, 367 (8th Cir. 1997) (rejecting as "meritless" defendant's claim that "his rights to due process, confrontation, and a fair trial were violated when the prosecution called one of the courtroom interpreters to testify briefly about his translation of a short note, written in Spanish, from one co-conspirator"). Therefore, even assuming proper exhaustion, the state court did not unreasonably apply federal law in rejecting this claim.[2]

---

[2] In the heading of Ground Two, Villanueva-Vasquez states that "appellate counsel" was "ineffective" for "admitting the Spanish texts into evidence when the jury did not speak Spanish, and there was no written translation." (Dkt. 1 at 21) The body of Ground Two makes clear that Villanueva-Vasquez

**C.    Ground Three—Failure to Move for Judgment of Acquittal Based on Alleged Lack of Evidence Establishing "Identity of the Intruder"**

Villanueva-Vasquez contends that trial counsel should have sought a judgment of acquittal based on the prosecution's alleged failure "to prove that it was [ ] Villanueva-Vasquez who entered the home and tried to kill" the victim. (Dkt. 1 at 25-26) According to him, neither the victim nor her male companion (Wilson Chaparro) could "identify the intruder." (Id.) Thus, he argues that counsel rendered ineffective assistance by failing to move for a judgment of acquittal on the ground that the prosecution "could not prove that [he] was the person who committed the crime." (Id. at 26)

The postconviction court rejected this claim. (Dkt. 8-3, Ex. 21, at 12) It began by quoting a portion of the victim's testimony about the incident. (Id. at 6-8) As noted above, the victim stated that the intruder wore a ski mask and a "charcoal Nike hoodie." (Dkt. 8-2, Ex. 9, at 259) The victim immediately identified the intruder as Villanueva-Vasquez based on his "eyes and mouth"; she also recognized the hoodie, which Villanueva-Vasquez had received from the victim's brother "back in 2007." (Id. at 260) Based on this testimony, the court found that Villanueva-Vasquez's "identity as the perpetrator was a factual issue to be resolved by the jury." (Dkt. 8-3, Ex. 21, at 12) Thus, in the postconviction court's view, "even if [Villanueva-Vasquez's] counsel had made the exact motion for judgment of acquittal as [he] allege[d], the [trial court]

---

seeks to raise a claim of trial-court error, not ineffective assistance of appellate counsel. (Id. at 22-23) Regardless, any claim of ineffective assistance of appellate counsel would be both unexhausted and procedurally defaulted because Villanueva-Vasquez never raised such a claim in state court.

would have denied the motion for judgment of acquittal based on the evidence." (Id.) For that reason, there was no basis to conclude that "counsel's failure to make the alleged motion for judgment of acquittal resulted in prejudice." (Id.)

The rejection of this claim was reasonable. "[A]lthough the issue of ineffective assistance . . . is one of constitutional dimension," a court "must defer to the state's construction of its own law when the validity of the [ineffective-assistance] claim . . . turns on state law." Pinkney v. Sec'y, DOC, 876 F.3d 1290, 1295 (11th Cir. 2017). That is the case here. The postconviction court found that Villanueva-Vasquez suffered no prejudice because, as a matter of Florida law, the proposed motion for judgment of acquittal would have been denied. (Dkt. 8-3, Ex. 21, at 12) Thus, the postconviction court "already has told us how the issues would have been resolved under Florida state law had [counsel] done what [Villanueva-Vasquez] argues he should have done." Herring v. Sec'y. Dep't of Corr., 397 F.3d 1338, 1354-55 (11th Cir. 2005). This Court is bound to defer to that determination. See, e.g., Smith v. Sec'y, Dep't of Corr., No. 8:18-cv-49-KKM-SPF, 2021 WL 1214948, at *12 (M.D. Fla. Mar. 31, 2021) ("[T]o the extent the state court concluded the motions for judgment of acquittal would have been denied, this Court is obliged to defer because that is a question of state law.").

In short, the postconviction court "authoritatively decided as a matter of [Florida] law" that Villanueva-Vasquez's proposed argument lacked merit. Calhoun v. Warden, Baldwin State Prison, 92 F.4th 1338, 1351 (11th Cir. 2024). It is well established that a petitioner is not "prejudiced by his counsel's failure" to "raise a meritless claim." Hittson v. GDCP Warden, 759 F.3d 1210, 1262 (11th Cir. 2014).

Thus, the postconviction court reasonably concluded that Villanueva-Vasquez suffered no prejudice from counsel's failure to make a futile motion for judgment of acquittal.

Even if the issue were the Court's to decide, Villanueva-Vasquez would not be entitled to relief. "Whether to grant a motion for judgment of acquittal hinges on the sufficiency of the evidence presented at trial and what factual findings the jury could fairly and reasonably infer from that evidence." Deamelio v. State, 341 So. 3d 463, 467 (Fla. 2d DCA 2022). "The standard to be employed for all criminal cases regarding the sufficiency of the evidence is simply whether the State presented competent, substantial evidence to support the verdict." Id. "This standard is met when the evidence relied upon to sustain the ultimate finding [is] sufficiently relevant and material [such] that a reasonable mind would accept it as adequate to support the conclusion reached." Id.

The evidence at trial was sufficient to establish Villanueva-Vasquez's identity as the perpetrator. The victim was Villanueva-Vasquez's estranged wife of six years. She testified that the intruder wore a ski mask and a "charcoal Nike hoodie." (Dkt. 8-2, Ex. 9, at 259) As explained above, the victim immediately identified the intruder as Villanueva-Vasquez based on (1) his "eyes and mouth" and (2) the Nike hoodie, which Villanueva-Vasquez had received from the victim's brother "back in 2007." (Id. at 260) Furthermore, during the struggle, the victim's male companion heard her say, "Stop, Julio." (Id. at 176) A "reasonable mind would accept [this evidence] as adequate to support the conclusion" that Villanueva-Vasquez was the perpetrator. Deamelio, 341

So. 3d at 467; see also State v. Peterson, No. W201700307CCAR3CD, 2018 WL 1363501, at *7 (Tenn. Crim. App. Mar. 15, 2018) (evidence sufficient to establish identity where victim "said that she recognized the Defendant as the perpetrator by his eyes and that she was '100 percent sure' that the Defendant was her attacker"). Thus, counsel was not deficient for failing to seek a judgment of acquittal on this basis.

### D.    Ground Four—Failure to Ensure That Interpreter was "Properly Sworn" During Sentencing

Villanueva-Vasquez contends that trial counsel was ineffective for failing to ensure that the Spanish-language interpreter was "properly sworn" during his sentencing hearing. (Dkt. 1 at 28-29) Florida law requires a court interpreter to "take an oath that he or she will make a true interpretation of the questions asked and the answers given." Fla. Stat. § 90.606(3). Villanueva-Vasquez separately alleges that he learned to speak Spanish in Puerto Rico, whereas the interpreter "seem[ed] to be from another [c]ountry" and spoke "a different dialect" of Spanish. (Id. at 29) As a result, Villanueva-Vasquez allegedly "did not understand the [sentencing] proceedings," which counsel "should have . . . objected to." (Id.)

The postconviction court rejected this claim on the ground that Villanueva-Vasquez could not "prove that counsel acted deficiently." (Dkt. 8-3, Ex. 21, at 24) The court explained that the interpreter was in fact "properly sworn." (Id.) In support, the court cited the following portion of the sentencing transcript:

> [DEFENSE COUNSEL]: Hello, Judge. Mr. Villanueva[-Vasquez] is present and in custody. We have the services of the Spanish-speaking interpreter here.

THE COURT: Okay.

THE INTERPRETER: Good afternoon, Your Honor.

THE COURT: Good afternoon. The interpreter can please state your name for the record.

THE INTERPRETER: Yes, Your Honor. For the record, my name is Gaetano Garibaldi. I'm the state court interpreter for Spanish and English.

THE COURT: Very good. If you'll raise your right hand.

THE INTERPRETER: Yes, Your Honor.

(Interpreter sworn.)

THE INTERPRETER: I do, Your Honor.

THE COURT: Okay. Very good.

(Dkt. 8-2, Ex. 12, at 3)

The rejection of this claim was reasonable. As an initial matter, nothing in the record suggests that the interpreter was not "properly sworn." (Dkt. 1 at 28) To the contrary, the transcript shows that the court swore in the interpreter at the beginning of the hearing. (Dkt. 8-2, Ex. 12, at 3) Villanueva-Vasquez presents no evidence that the swearing-in was procedurally improper. As the petitioner, he bears the "burden" of proving "the facts necessary to demonstrate his counsel's performance was constitutionally defective." Blankenship v. Hall, 542 F.3d 1253, 1274 (11th Cir. 2008). Because there is no basis to believe that the swearing-in of the interpreter was improper, counsel was not deficient for failing to raise the issue. See Freeman v. Atty.

Gen., 536 F.3d 1225, 1233 (11th Cir. 2008) (noting that "[a] lawyer cannot be deficient for failing to raise a meritless claim").

Nor was counsel ineffective for failing to object to Villanueva-Vasquez's alleged inability to understand the interpreter. "To show that an attorney failed to discharge his Sixth Amendment duty, a petitioner must establish that the attorney's conduct amounted to incompetence under prevailing professional norms." Hittson, 759 F.3d at 1248 (emphasis omitted). "[A] petitioner must establish that no competent counsel would have taken the action that his counsel did take." Chandler v. United States, 218 F.3d 1305, 1315 (11th Cir. 2000).

Villanueva-Vasquez alleges that he "did not understand the [sentencing] proceedings" because the interpreter spoke a Spanish dialect with which he was unfamiliar. (Dkt. 1 at 29) But he does not claim that he ever informed counsel of this alleged fact. Moreover, although Villanueva-Vasquez cogently addressed the court in response to question interpreted by the interpreter during the hearing, he never indicated that he could not understand the interpreter. (Dkt. 8-2, Ex. 12, at 22-32) In these circumstances, there is no basis to conclude that counsel knew—or should have known—that Villanueva-Vasquez had any difficulty understanding the interpreter. Thus, counsel was not deficient for failing to raise Villanueva-Vasquez's proposed objection. See Wu v. United States, No. 4:17-cr-1, 2024 WL 4278269, at *4 (E.D. Tex. Sept. 24, 2024) (counsel not deficient for "failing to recognize and correct the problem with the interpreter" because petitioner "fail[ed] to even allege that he somehow put counsel on notice that he could not understand the interpreter").

### E.    Ground Five—Failure to Call Victim's Aunt and Uncle as Witnesses

Villanueva-Vasquez contends that trial counsel was ineffective for failing to call the victim's aunt and uncle as witnesses. (Dkt. 1 at 31-32) As noted above, the victim lived in an "efficiency" in her aunt and uncle's garage. (Dkt. 8-2, Ex. 9, at 191-92, 246) Her aunt and uncle were home at the time of the incident. (Id. at 246) According to Villanueva-Vasquez, the aunt and uncle "would have testified that they heard no noise or yelling coming from" the garage. (Dkt. 1 at 31) Villanueva-Vasquez alleges that counsel "guaranteed that he would be calling these witnesses at trial" but failed to do so. (Id. at 32) In Villanueva-Vasquez's view, their testimony would have "support[ed]" his misidentification defense and "placed doubt in the minds of the jury" as to whether a burglary occurred. (Id. at 31-32)

The postconviction court rejected this claim for lack of prejudice. (Dkt. 8-3, Ex. 30, at 6-7) It found that "there was no issue of misidentification in this case [because] the victim was [Villanueva-Vasquez's estranged wife] who testified at trial that she recognized his mouth and eyes and that she could see through the ski mask, as well as the gray hood[ie] he had on." (Id. at 6) The court also cited the testimony of the victim's male companion, who recounted that "during the struggle, the victim said, '[S]top, Julio.'" (Id.) Thus, the court held that, "based on the overwhelming evidence at trial, even if [Villanueva-Vasquez's] counsel had called the [ ] victim's aunt and uncle and they testified that they did not hear any noise or yelling coming from the [ ] victim's side of the building, it would not have changed the outcome of the trial." (Id. at 6-7)

That ruling was reasonable. "The prejudice prong requires the petitioner to establish a reasonable probability that, but for counsel's errors, the outcome at trial would have been different." Reed v. Sec'y, Fla. Dep't of Corr., 767 F.3d 1252, 1261 (11th Cir. 2014). "It is not enough for the [petitioner] to show that the errors had some conceivable effect on the outcome of the proceeding." Strickland, 466 U.S. at 693. Instead, "counsel's errors [must be] so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable." Id. at 687. "Applying AEDPA to Strickland's prejudice standard, [this Court] must decide whether the state court's conclusion that [counsel's] performance . . . didn't prejudice [Villanueva-Vasquez]—that there was no substantial likelihood of a different result—was so obviously wrong that its error lies beyond any possibility for fairminded disagreement." Mungin v. Sec'y, Fla. Dep't of Corr., 89 F.4th 1308, 1317 (11th Cir. 2024).

Villanueva-Vasquez cannot meet this demanding standard. As an initial matter, the aunt and uncle's testimony—that they heard no noise coming from the garage— would have had no bearing on the identity of the intruder. The only potential relevance of the testimony would be to suggest that no intruder broke into the residence and attacked the victim. But the prosecution presented overwhelming evidence that a burglary took place. Both the victim and her male companion testified that an intruder entered the residence and attacked the victim. (Dkt. 8-2, Ex. 9, at 151, 261-63) The victim explained that she caught the intruder "trying to break in" with a screwdriver; after the incident, law enforcement recovered a "screwdriver without a handle" outside the residence. (Id. at 252, 254, 403-04) The victim also testified that the

intruder unsuccessfully attempted to shoot her three times and that he racked the slide of the handgun after pulling the trigger. (Id. at 265-71) That testimony was corroborated by the recovery of a live .380 bullet on the threshold of the front door. (Id. at 401) Moreover, all four tires on the male companion's car were "punctured and slashed," and law enforcement found an "open pocketknife" "on the ground outside [the] front door." (Id. at 400-01) Finally, the jury heard the 911 call, which was placed while the intruder was still in the residence. (Id. at 270-71) During the call, the victim told the operator, "I have a restraining order against the father of my child and he was trying to break into my house." (Id. at 278)

Given the overwhelming evidence that a burglary occurred as described by the victim and her companion, there is no "reasonable probability that, but for counsel's [failure to present testimony from the aunt and uncle], the outcome at trial would have been different." Reed, 767 F.3d at 1261; see also Bates v. Sec'y, Fla. Dep't of Corr., 768 F.3d 1278, 1300 n.9 (11th Cir. 2014) (noting that "[t]he overwhelming evidence of [petitioner's] guilt . . . makes it obvious that [he] cannot show Strickland prejudice"); United States v. Andrews, 953 F.2d 1312, 1327 (11th Cir. 1992) (rejecting ineffective-assistance claim based on failure to call witnesses because, "even had the witnesses' testimony been presented to the jury, the verdict would have remained the same").

Moreover, Villanueva-Vasquez offers no evidence that the aunt and uncle would have testified as he suggests. The record does not contain affidavits from the alleged witnesses, and they did not testify at the evidentiary hearing. Villanueva-Vasquez's unsupported assertions about how the aunt and uncle would have testified

"are not enough to establish prejudice." <u>McKiver v. Sec'y, Fla. Dep't of Corr.</u>, 991 F.3d 1357, 1365 (11th Cir. 2021); <u>see also</u> <u>United States v. Ashimi</u>, 932 F.2d 643, 650 (7th Cir. 1991) ("[E]vidence about the testimony of a putative witness must generally be presented in the form of actual testimony by the witness or on affidavit. A defendant cannot simply state that the testimony would have been favorable; self-serving speculation will not sustain an ineffective assistance claim."). Accordingly, the postconviction court reasonably rejected Villanueva-Vasquez's claim for lack of prejudice.

### F.    Ground Six—Failure to Obtain Video Footage from Villanueva-Vasquez's House

Villanueva-Vasquez argues that trial counsel provided ineffective assistance by failing to obtain video footage showing the outside of his residence on the night of the burglary. (Dkt. 1 at 34-35) As noted above, the break-in took place at approximately 1:30 a.m. on May 19, 2013. (Dkt. 8-2, Ex. 9, at 150) The victim's residence was located "a little bit less than a mile" from Villanueva-Vasquez's house. (<u>Id.</u> at 419) The footage in question came from a surveillance camera installed by Villanueva-Vasquez. (Dkt. 8-3, Ex. 31, at 6) It showed him leaving his house at 8:55 p.m. on May 18 and returning at 2:51 a.m. on May 19.[3] (<u>Id.</u> at 14) According to Villanueva-Vasquez, the footage would have been exculpatory because it showed him wearing clothes that "did not match the clothing that the victim described." (<u>Id.</u> at 9) Specifically, the victim testified

---

[3] A crime scene technician testified at trial that surveillance footage was recovered from Villanueva-Vasquez's residence, but the footage itself was not admitted into evidence. (Dkt. 8-2, Ex. 9, at 493-94) The technician stated that, to her knowledge, the footage had not been "analyzed." (<u>Id.</u> at 495)

that the intruder wore a ski mask, hoodie, and gloves, whereas the footage showed Villanueva-Vasquez wearing a "grey and red T-shirt" when he left the residence and returned. (Id. at 8-9; see also Dkt. 8-2, Ex. 9, at 322-25)

The postconviction court held an evidentiary hearing on this claim. Defense counsel testified that he was aware of the footage from discussions with Villanueva-Vasquez and that law enforcement had recovered it during the investigation. (Dkt. 8-3, Ex. 31, at 20-22) Counsel did not, however, ask the State to turn over the footage. (Id. at 22) He explained that the footage did not provide a "moment-by-moment alibi" for Villanueva-Vasquez. (Id. at 23) To the contrary, it "tied down a timeframe that would have allowed [Villanueva-Vasquez] to leave" his house at 8:55 p.m., commit the burglary around 1:30 a.m., change clothes, and   return at 2:51 a.m. (Id. at 37) In counsel's view, the prosecution could easily explain the change of clothes by arguing that "[Villanueva-Vasquez] knows he has cameras" at his house. (Id.) Counsel also noted that Villanueva-Vasquez had told the public defender initially assigned to the case that he had "[gone] over [to the victim's] residence and damaged the door," but that he "didn't damage the tire[s] and he didn't have a gun." (Id. at 25-26)

In addition, counsel was concerned that if he requested the footage from the State, the prosecution would be more likely to present the video at trial and potentially undermine his defense. (Id. at 25-27) Counsel's theory of the case was that law enforcement had conducted an inadequate and "bias[ed]" investigation. (Dkt. 8-2, Ex. 9, at 535-36) During closing argument, counsel stressed that although the police recovered surveillance footage from Villanueva-Vasquez's house, "[n]obody ha[d]

ever bothered to watch" it, nor had anyone "bothered to investigate" "what he was wearing" or whether he "was at home" during the burglary. (<u>Id.</u> at 536) Had the footage been played at trial, however, the prosecution could have argued that the police had conducted a complete investigation and the results showed that "[Villanueva-Vasquez] [had] enough time to change clothes, commit the crime, and come back." (Dkt. 8-3, Ex. 31, at 37) Instead, because the footage was not presented at trial, counsel was able to argue that law enforcement had "not really investigat[ed] their case." (<u>Id.</u> at 35)

Villanueva-Vasquez testified at the hearing as well. He stated that he had asked counsel to "show [the] footage at the trial," that counsel said he would do so, and that he learned on the first day of trial that counsel would not be presenting the video. (<u>Id.</u> at 7-8) Villanueva-Vasquez also claimed that he "never" told his initial public defender that he had been to the victim's house on the night of the burglary. (<u>Id.</u> at 41) On cross-examination, he admitted that "there would have been plenty of time" for him to "get rid of" a hoodie, ski mask, and gun between "1:30 in the morning [the time of the burglary], and when [he] arrived back home at approximately 2:51 in the morning." (<u>Id.</u> at 16)

Following the hearing, the postconviction court rejected Villanueva-Vasquez's claim in a written order. (<u>Id.</u>, Ex. 33) The court began its analysis by deeming "[counsel's] testimony more credible than that of" Villanueva-Vasquez. (<u>Id.</u> at 18) It found that Villanueva-Vasquez had told his first public defender "that he did go to the victim's house and maybe did a little damage, but did not do everything he was being

accused of." (Id.) Next, the court held that the surveillance footage "did not contain any evidence to support [Villanueva-Vasquez's] allegations that the video would have challenged the State's theory." (Id.) Specifically, "there was ample time between his departure and return to the house for him to change clothes and commit the crime[,] and the video did not provide a moment-by-moment alibi for" him. (Id.) Thus, the court ruled that counsel made "a reasonable, strategic decision" not to "obtain the video surveillance because it would not have helped his defense that the State had failed to investigate the case and failed to present enough evidence to prove the offenses." (Id.) For that reason, Villanueva-Vasquez "failed to prove that [counsel] acted deficiently or any resulting prejudice." (Id.)

The rejection of this claim was reasonable. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." Strickland, 466 U.S. at 690. A strategic choice "will be held to have been ineffective assistance only if it was so patently unreasonable that no competent attorney would have chosen it." Dingle v. Sec'y for Dep't of Corr., 480 F.3d 1092, 1099 (11th Cir. 2007). "Because Strickland allows for a range of strategic choices by trial counsel, so too is there considerable leeway for state courts to determine the reasonableness of those choices." Franks v. GDCP Warden, 975 F.3d 1165, 1176 (11th Cir. 2020). Therefore, to prevail on his ineffective-assistance claim, Villanueva-Vasquez must "show that no reasonable jurist could find that his counsel's performance fell within the wide range of reasonable professional conduct." Id.

Villanueva-Vasquez fails make this showing. A reasonable jurist could conclude that counsel acted "within the wide range of reasonable professional conduct" when he declined to obtain the video footage. Franks, 975 F.3d at 1176. As counsel explained at the hearing, the footage could have hurt the defense by corroborating a timeframe that would have allowed Villanueva-Vasquez to leave his house at 8:55 p.m., commit the burglary around 1:30 a.m., change his clothes, and return at 2:51 a.m. (Dkt. 8-3, Ex. 31, at 37) To be sure, the footage showed Villanueva-Vasquez wearing clothes that differed from those described by the victim. (Id. at 8-9) But the prosecution would have had an obvious rebuttal—Villanueva-Vasquez knew about the surveillance camera because he had installed it himself, and he tried to avoid leaving incriminating footage by changing his clothes after he left the house and changing them back from the clothes worn during the commission of the crime. (Dkt. 8-3, Ex. 31, at 37)

Moreover, as the postconviction court explained, counsel made "a reasonable, strategic decision" not to "obtain the video surveillance because it would not have helped his defense that the State had failed to investigate the case and failed to present enough evidence to prove the offenses." (Id., Ex. 33, at 18) Counsel vigorously pursued this defense at trial. He argued in closing that law enforcement's investigation was inadequate, highlighting that "[n]obody ha[d] ever bothered to watch" the surveillance footage, nor had anyone "bothered to investigate" "what [Villanueva-Vasquez] was wearing" in the footage or whether he "was at home" during the burglary. (Dkt. 8-2, Ex. 9, at 536) That defense would have been difficult to maintain

had the prosecution presented the footage at trial. In that case, the State could have argued that the police had done "a complete investigation and still given [Villanueva-Vasquez] enough time to change clothes, commit the crime, and come back." (Dkt. 8-3, Ex. 31, at 37)

Given these strategic considerations, a reasonable jurist could conclude that "[some] competent counsel would have taken the action that [Villanueva-Vasquez's] counsel did take." Chandler, 218 F.3d at 1315. Thus, the ineffective-assistance claim fails.

### G.    Ground Seven—Failure to Call Probation Officer and Produce Violation Affidavit at Violation-of-Probation Hearing

Lastly, Villanueva-Vasquez contends that trial counsel was ineffective for failing to call his probation officer as a witness at the violation-of-probation hearing. (Dkt. 1 at 37-38) He also argues that counsel should have presented the "affidavit for violation of probation" at the hearing. (Id.) As noted above, Villanueva-Vasquez was on probation when he committed his crimes. (Dkt. 8-2, Ex. 4) After the guilty verdict, the trial court revoked his probation and sentenced him to "time served" for violating his probation by committing new criminal conduct. (Id., Ex. 5; Ex. 12, at 34) According to Villanueva-Vasquez, the probation officer and the affidavit could have "played a role in obtaining a better sentence" for his probation violation by providing "an alternative narrative" of the events described at trial. (Dkt. 1 at 38)

The Court lacks jurisdiction over this claim because Villanueva-Vasquez is not in custody pursuant to his probation-violation conviction. Federal district courts may

not entertain a petition for habeas corpus relief unless the petitioner is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3); 28 U.S.C. § 2254(a). The Supreme Court has interpreted the "in custody" language to require "that the habeas petitioner be 'in custody' under the conviction or sentence under attack at the time his petition is filed." Maleng v. Cook, 490 U.S. 488, 490-91 (1989). Accordingly, once the sentence for a conviction has fully expired, the petitioner is no longer "in custody" for purposes of challenging that conviction. Id. at 491-92.

Villanueva-Vasquez fails to satisfy the "in custody" requirement as to Ground Seven. That claim challenges his conviction for violating his probation. (Dkt. 1 at 37-40) Because he was sentenced to time served for the violation, he is no longer in custody under that conviction and cannot challenge it under § 2254. See Aquino v. Sec'y, Dep't of Corr., No. 8:21-cv-278-WFJ-SPF, 2024 WL 361094, at *6 n.6 (M.D. Fla. Jan. 31, 2024) ("When [petitioner] filed his § 2254 petition in 2021, he was not 'in custody' on the violation of a domestic injunction conviction because he received a sentence of time-served on November 20, 2018, and, thus, his sentence fully expired on that date.").

Even if the Court had jurisdiction over this claim, it would still fail because it is procedurally defaulted. Villanueva-Vasquez raised Ground Seven in his Rule 3.850 motion. (Dkt. 8-3, Ex. 20, at 17-20) The postconviction court held that the claim was "procedurally barred as untimely under [R]ule 3.850(b)." (Id., Ex. 21, at 28) Because "the procedural requirements of Florida's Rule 3.850 constitute independent and

adequate state grounds," Ground Seven is procedurally defaulted. LeCroy v. Sec'y, Fla. Dep't Corr., 421 F.3d 1237, 1260 n.25 (11th Cir. 2005). Villanueva-Vasquez makes no attempt to show cause and prejudice for the default, nor does he excuse the default based on the miscarriage-of-justice exception. See Mincey v. Head, 206 F.3d 1106, 1135 (11th Cir. 2000) ("It is well-settled that federal habeas courts may not consider claims that have been defaulted in state court pursuant to an adequate and independent state procedural rule, unless the petitioner can show 'cause' for the default and resulting 'prejudice,' or 'a fundamental miscarriage of justice.'"). As a result, even if jurisdiction existed over Ground Seven, Villanueva-Vasquez would not be entitled to relief.

## IV.   CONCLUSION

Upon consideration of the foregoing, it is hereby **ORDERED** as follows:

1. Villanueva-Vasquez's petition for writ of habeas corpus, (Dkt. 1), is **DENIED**.

2. The Clerk is **DIRECTED** to enter judgment against Villanueva-Vasquez and to **CLOSE** this case.

3. Because Villanueva-Vasquez neither makes a substantial showing of the denial of a constitutional right nor demonstrates that reasonable jurists would find debatable both the merits of the underlying claims and the procedural issues that he seeks to raise, a certificate of appealability and leave to appeal *in forma pauperis* are **DENIED**. 28 U.S.C. § 2253(c)(2); Slack v. McDaniel, 529 U.S. 473, 478 (2000).

**DONE** and **ORDERED** in Tampa, Florida, this 25th day of November 2024.

_____
MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE